UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SUE JEN EITER, )<br>)<br>   Plaintiff, )<br>)<br>  v. )<br>)<br>THREE RIVERS FEDERAL CREDIT )<br>UNION, )<br>)<br>   Defendant. ) | CAUSE NO.: 1:05-CV-418 |

## OPINION AND ORDER

### I. INTRODUCTION

  The Plaintiff, Sue Jen Eiter, is suing her former employer, Three Rivers Federal Credit Union, because she claims that her termination as an assistant branch manager was based on her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and her national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*[1]

  Three Rivers filed a Motion for Summary Judgment on September 15, 2006 (Docket # 14). On October 25, 2006, Eiter filed a response (Docket # 18), and Three Rivers replied on November 13, 2006. (Docket # 19.)

  For the reasons provided, Three Rivers's Motion for Summary Judgment will be GRANTED.

---

  [1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

## II. FACTUAL BACKGROUND[2]

Eiter was born in Taiwan and was fifty-seven years old when Three Rivers terminated her. Three Rivers is headquartered in Fort Wayne, Indiana, and has approximately two hundred employees. Before her stint at Three Rivers, Eiter worked for NBD Bank but purportedly left for a better opportunity elsewhere, or at least that is what Three Rivers thought when it hired her.[3]

In February 1999, Eiter applied for and was offered a position at Three Rivers but declined it, choosing instead to remain with her employer, National City Bank, because it had offered her a position as manager. Eventually, however, Eiter changed her mind and accepted a position as an assistant manager at Three Rivers's North Clinton Street branch in May 1999. As the assistant manager, Eiter reported to the branch manager and helped the branch manager supervise the branch employees. If the branch manager was absent, she performed the day-to-day functions of the branch manager.

In September 2000, Eiter requested a transfer to Three Rivers's Georgetown branch because it was closer to her home. Three Rivers granted this request because the Georgetown branch allegedly needed Eiter's experience. At the Georgetown branch, she was supervised by branch manager Mary Dolk, and apparently the two of them got along very well during the five-and-one-half years that Eiter worked at the branch.

Nevertheless, Eiter's performance at the North Clinton and Georgetown branches was not

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Eiter, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] Eiter's career at NBD Bank apparently ended with some rancor; in fact, after she was fired in May 1995, she sued NBD Bank for sexual harassment. Because Eiter ostensibly disagreed with the reasons for her termination, she did not reveal her termination to Three Rivers on her job application; this failure to disclose would have resulted in her dismissal from Three Rivers if it had been discovered during her employment, a point the application form clearly divulges.

without some blemishes. Overall, she received three written warnings; the first occurred in February 2000, when she allegedly opened some customer sub-accounts (called "member sub-shares" in credit union parlance) without their permission. Eiter refused to sign this warning because she disagreed with it, and she temporarily lost at least part of a bonus from the event, though it was later reinstated. At Georgetown, Dolk issued Eiter two written warnings dealing with cash errors, although Eiter maintains that one of the errors was the result of a system-wide computer problem; in any event, neither situation affected Eiter's pay or any other conditions of her work.

In September 2004, Dolk provided Eiter with a performance review that generally rated Eiter as meeting expectations, but Dolk also opined that Eiter needed improvement in the category of "Conflict Resolution," as she needed "to display more objectivity when conflicts develop." (Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Resp. Br.") Ex. 3.) In particular, Dolk noted that "[t]here have been instances when [Eiter] lost control of her emotions during stressful situations." (Resp. Br. Ex. 3.) Dolk also gave an example of a situation where Eiter told a non-member to "shut up" when he complained because she could not cash a check for him. (Resp. Br. Ex. 3.)

On October 4, 2004, Eiter was abruptly transferred to the Dupont Road branch, receiving the word on a Thursday to report there the following Monday. When Eiter called Three Rivers's human resource manager, Lisa Phillips, for a postponement, she was told to call James Johnson, vice president of sales. Indeed, the transfer was Johnson's idea, as Three Rivers contends that Johnson wanted to bring a new assistant manager to the Georgetown branch to improve Dolk's inconsistent performance and that Johnson purportedly thought that Eiter would benefit from the

tutelage of the Dupont branch's manager, Valaine Vasquez, the trainer of other employees who were eventually promoted to branch managers.

Apparently unaware of Johnson's motive for the transfer, Eiter was upset at the short notice, particularly since it would adversely affect the time she spent each day caring for her elderly in-laws. Eiter contends that when Johnson called her the next day, she reiterated her request for a postponement to make arrangements for elder care, but he yelled, "[W]hy [are] you telling me [to] postpone[;] [w]hen I tell you to go, you should go," and, "[J]ob come[s] first, not your family." (Dep. of Sue Jen Eiter ("Eiter Dep.") 60, 64.) Although the content of the conversation is disputed,[4] the outcome is not: Johnson did not delay Eiter's transfer, and she reported to the Dupont branch as ordered.

It did not take long for problems to surface, and perhaps as early as November 2004, Phillips referred Eiter to Maureen Galligan, branch sales administrator, to discuss personal conflicts that had arisen between Eiter and Vasquez. In this meeting, Eiter complained to Galligan that Vasquez always claimed to be too busy to train her and that Vasquez caused her to work too many late shifts.[5] Galligan suggested that Eiter bring up her concerns with Vasquez directly, and although Eiter apparently sent a message to Vasquez, she received no response. Seeking resolution of the matter, Eiter again brought the problems within the branch to Galligan's attention, and at some point in January 2005 Galligan had a meeting with Eiter and Vasquez in an attempt to improve future communications between the two. However, shortly

---

[4] Three Rivers maintains that Eiter never mentioned her in-laws during the conversation but instead told Johnson that she needed a postponement because she did not have transportation to the Dupont branch.

[5] Notably, however, Eiter did not complain at the meeting with Galligan, or at any other time during her employment, of age or national origin discrimination.

4

after Galligan left, Vasquez began yelling at Eiter. Nevertheless, as January wore on the situation evidently improved somewhat, because Eiter admits that she told Galligan at least twice that month that she was not having any current problems with Vasquez.

Sometime in early February 2005, Eiter sent an e-mail to Galligan reporting that she and another employee had found an unsealed envelope in Vasquez's portion of the vault that contained keys that could open the branch teller's cash drawers. Before placing the teller keys in the vault, Vasquez is supposed to place them in an envelope in the presence of two credit union employees who place their initials on the envelope after it is sealed. Galligan purportedly brought the key incident to the attention of Johnson on February 22, 2005, although he believes the conversation took place the next day. In any event, Galligan eventually met with Vasquez regarding the key issue on February 23, 2005, revealing that Eiter and another employee had reported the incident and that it would likely result in a reprimand.

Shortly after Vasquez's conversation with Galligan, Vasquez presented a written reprimand to Eiter concerning a cash shortage that occurred in December 2004.[6] When Vasquez presented Eiter with the reprimand, she immediately asked Vasquez about the key incident, and when Vasquez did not answer, she refused to sign the reprimand and demanded to meet with upper management. Vasquez then called Galligan and Johnson for an immediate meeting at the Dupont branch to discuss with Eiter her refusal to sign the written reprimand. When Johnson and Galligan met with Eiter and Vasquez, Eiter again refused to sign the reprimand. According to Eiter's version of the events, she attempted to turn the meeting into an inquest about Vasquez's key security lapses, but this led Johnson to shake his finger in her face and ask, "[W]hat is your

---

[6] Although Vasquez and Galligan completed the final draft of the reprimand on February 10, 2005, Vasquez apparently did not have the final version to present to Eiter until February 23.

problem?" (Eiter Dep. 165.) Eiter, believing that Johnson's mind was already made up, accused Johnson, Galligan, and Vasquez of sticking together, and proceeded to tell Johnson her history of complaints to Galligan, but Johnson continued to shake his finger and yell. Deeming this to be mental abuse, Eiter left in frustration and once outside the room, ostensibly said, "[T]his freaking place, freaking go no where, freaking place." (Either Dep. 162.)

  The other witnesses to the meeting maintain that Eiter became upset and raised her voice, used the word "fuck," and stormed out of the room. Specifically, Johnson recalls that Eiter said, "[F]uck you." (Dep. of James Johnson 77.) Vasquez recalls that Eiter said, "Fuck this or fuck the credit union, fuck all of you." (Dep. of Valaine Vasquez 46.) According to Johnson, a calmer Eiter re-entered the room a few minutes later, although Eiter denies returning. Johnson contends that he then allowed her to speak, but when he asked for clarification of a point, she again became agitated, used the word "fuck," and stormed out of the room. Johnson immediately suspended Eiter for her insubordinate behavior and indicated that she would remain suspended until he could have a calmer conversation with her.

  On February 25, Johnson and Galligan met with Eiter at Three Rivers's headquarters. Johnson indicated that he wanted to discuss morale at the Dupont branch but that they needed to discuss Eiter's February 23 reprimand first. After Eiter signed the reprimand under protest, Johnson presented Eiter with a written reprimand for her behavior at the February 23 meeting. According to Eiter, she read the reprimand but refused to sign it because "I did not cuss at them at all." (Eiter Dep. 176.) When Eiter told Johnson that she would not sign the reprimand because it was not true, he simply stated, "[O]kay, you are fired." (Eiter Dep. 175.) According to Johnson, however, Eiter became angry and disrespectful at the February 25 meeting, raising her

6

voice and interrupting him. When he could not get Eiter to calm down, he concluded that she would not listen to him, so he terminated her employment.

Eiter now complains that the current management structure at Three Rivers is uniformly Caucasian, including all nineteen branch managers, and that since Johnson has become vice president of branch sales, none of the sixteen assistant managers that he has hired were persons of color or minorities, including Eiter's replacement. In addition, she contends that Johnson personally terminated two assistant managers of ethnic background.

Eiter also complains about Vasquez's problems at Three Rivers. Specifically, Eiter points out that Galligan admitted that she believed the branch was out of control and in melt down mode in early 2004 due to Vasquez's behavior. As a result of her concerns, Galligan interviewed various branch employees, who relayed that (1) Vasquez frequently discussed employee performance with individuals other than the employee; (2) Vasquez showed favoritism to certain employees by crediting loans to them; and (3) employees were apprehensive to speak to Vasquez about their concerns. In addition to these issues, Vasquez received three written reprimands from May 2004 until February 2005 for excessive "NSF," cash shortages, and creating conditions that interfered with delivery of services to members.

Galligan ostensibly attributed Vasquez's professional problems to problems in her personal life, as she met with Vasquez on March 1, 2005, to suggest that Vasquez take a leave of absence to get her personal life in order. Galligan also placed Vasquez on an action plan, and Vasquez continued working for Three Rivers until her voluntary resignation in June 2005.

Three Rivers argues in its Motion for Summary Judgment that even though there may be some factual disputes surrounding exactly what happened in the two meetings that led to Eiter's

7

firing, there is no dispute that she was insubordinate, and in any event, Eiter cannot point to any younger, non-Chinese employees who were treated more favorably. Eiter concedes that she has no direct evidence of discrimination but argues that the facts viewed in a light most favorable to her leads to inferences that she was not insubordinate and that the actions of Vasquez were equally serious even though Vasquez was not ultimately fired

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### IV. DISCUSSION

A plaintiff alleging employment discrimination can contest summary judgment by using

either the direct or indirect method of proof. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006). The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, to create a triable issue of whether the adverse employment action had a discriminatory motive. *Id.*

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *E.g.*, *id.* at 696. Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). For Title VII and ADEA claims, the *prima facie* case requires four showings: (1) the plaintiff was a member of a protected class; (2) the plaintiff was meeting the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) similarly-situated employees who were not members of the plaintiff's protected class were treated more favorably. *Ptasznik*, 464 F.3d at 696 (citing *McDonnell Douglas*, 411 U.S. at 802; *Rozkowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005)). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id.* at 804.

Because Eiter concedes that she cannot make out a case under the direct method, her claim rests upon the *McDonnell Douglas* framework. For purposes of summary judgment, Three Rivers concedes that Eiter has established the first and third elements of her *prima facie* case of national origin and age discrimination but contends that Eiter's case ultimately fails on the

second and fourth elements.[7]

The Court agrees that Eiter fails to establish the fourth element of her *prima facie* case–that similarly-situated employees who were not members of Eiter's protected class were treated more favorably than her. To be "similarly situated," a plaintiff must show that another employee is "directly comparable to her in all material respects." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Specifically, the plaintiff must show that she and the other employee are comparable "in regard to performance, qualifications, and conduct," which "normally entails a showing that the [comparable] employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 676 (7th Cir. 2006).

Here, Eiter maintains that branch manager Vasquez, who is a younger, non-Chinese employee, was similarly situated to her.[8] At the outset, she has a steep obstacle in her way

---

[7] Because Eiter's *prima facie* case fails on the fourth prong and because the issues overlap regarding whether Eiter met Three Rivers's legitimate expectations and whether Three Rivers's proffered reason for firing her was pretexual, the Court need not discuss the second prong but instead will consider the parties' arguments under the pretext umbrella. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 451 (7th Cir. 1999) (opining that the analysis of an employer's legitimate expectations "often dovetails" with that of pretext); *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (declining to decide whether employee met employer's legitimate expectations because "a more surefooted ground for decision is the lack of any pretext in the [employer's] articulated reason for the termination); *Mullet v. Supreme Corp.*, No. 3:02-CV-665-RM, 2006 WL 2623303, at *4 (N.D. Ind. Sept. 12, 2006) (proceeding directly to the issue of pretext); *Erwin v. Dutch Housing, Inc.*, No. 1:03-CV-21-TS, 2004 WL 3177915, at *7 & n.5 (N.D. Ind. Feb. 24, 2004) (noting that the court "need not march through the entire *McDonnell Douglas* burden shifting analysis where one issue, such as the lack of pretext, proves to be dispositive).

[8] Eiter's ADEA claim fails to make it out of the gate because her only argument regarding age discrimination is that an allegedly "younger" Vasquez was similarly situated to her. In order to prevail on an ADEA claim, the plaintiff must demonstrate that the similarly situated employee was "substantially younger" than the plaintiff. *Jordan v. City of Gary*, 396 F.3d 825, 835 (7th Cir. 2005); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003) ("The Seventh Circuit has defined 'substantially younger' as generally ten years younger."). Eiter's response brief contains no recitation of Vasquez's age nor any argument that Vasquez was substantially younger than Eiter. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1056 (7th Cir. 2004) (finding that plaintiff's *prima facie* case of age discrimination failed because plaintiff did not argue that comparison employees were substantially younger). Accordingly, Eiter's ADEA claim against Three Rivers instantly fails, and

because a plaintiff is not "ordinarily . . . similarly situated to another employee when the plaintiff is subordinate to that employee." *Burks*, 464 F.3d at 751; *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("The most significant fact distinguishing [plaintiff] from [the comparison employee] is that, at the time of [plaintiff's] termination, *[plaintiff] was subordinate to [the comparison employee] on the task force*.") (emphasis in original). Eiter ostensibly does not dispute that Vasquez, as branch manager, was her superior; instead, she claims that this is not dispositive because Eiter undertook the duties of Vasquez in Vasquez's absence. Eiter, however, makes no claim that she and Vasquez performed the same job functions on a day-to-day basis at the branch, when both are ostensibly working; therefore, the fact that she occasionally performs Vasquez's job duties is not enough to establish that she is similarly situated to her superior. *See Hartzol v. McDonald's Corp.*, 437 F. Supp. 2d 805, 816 (N.D. Ill. 2006) (finding that a manager was not similarly situated to a "first assistant manager," even though the assistant manager was "acting as a manager").

Furthermore, Eiter fails to demonstrate that she and Vasquez engaged in similar offending conduct. Eiter provides a list of complaints regarding Vasquez's job performance, including that Vasquez gossiped about other employees' performance; showed favoritism towards certain employees; was difficult to speak with; and was written up for excessive "NSF," cash shortages, and creating conditions that interfered with delivery of services to members. Notably, Eiter fails to argue that Vasquez was ever insubordinate to her superiors, which, of course, is Three Rivers's purported reason for firing Eiter. Thus, Eiter and Vasquez did not have a "comparable set of failings" and cannot be deemed to be similarly situated. *Burks*, 464 F.3d at

---

the Court does not need to engage in further discussion regarding this claim.

751 (finding that plaintiff failed to demonstrate that a fellow employee's job performance was "similar" because the employee did not share the plaintiff's "alleged shortcomings"); *see also Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 745 (7th Cir. 2002) (opining that the plaintiff provided an "unusable comparison" when the alleged similarly-situated employee "was fired for being involved in an altercation with another employee at work, *not for insubordination*") (emphasis in original).

Because Eiter fails on the fourth prong of her *prima facie* case, her claim against Three Rivers collapses. Nevertheless, even if Eiter could establish a *prima facie* case of discrimination, her claim still fails because she does not demonstrate that Three Rivers's proffered reason for firing her was pretextual.

Three Rivers provides a legitimate, nondiscriminatory reason for Eiter's termination–Eiter's insubordinate behavior at the meetings on February 23 and 25. *See Flores v. Preferred Technical Group*, 183 F.3d 512, 515 (7th Cir. 1999) ("Insubordination is a legitimate, nondiscriminatory reason for firing an employee."). Specifically, Three Rivers maintains that even if Eiter's version of events is credited, she was still insubordinate at the February 23 meeting when she uttered the word "freaking," refused to sign the reprimand regarding the cash shortage, and stormed out of the meeting. Furthermore, Three Rivers contends that Eiter was insubordinate at the February 25 meeting when she refused to sign the reprimand for her behavior at the February 23 meeting.

It is now Eiter's burden to demonstrate that the proffered reason is a lie. In that regard, the focus of a pretext inquiry is "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Ptasznik*, 464 F.3d at 696 (quoting *Stewart v.*

12

*Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."). Simply put, pretext is "a deliberate falsehood."[9] *Forrester*, 453 F.3d at 419.

Here, Eiter provides a number of reasons for why she believes that Three Rivers's reason for terminating her–that she was insubordinate–"does not represent the truth[.]" (Resp. Br. 20.) For example, Eiter denies using the word "fuck" at the February 23 meeting; instead, she maintains that she used the word "freaking." Accepting Eiter's version as true, her contentions lead to two alternative inferences: (1) Vasquez, Galligan, and Johnson mistook the word "freaking" for "fuck," or (2) they all heard her say "freaking" and now claim she said, "Fuck."[10] If indeed the three simply misheard her, this mistake does not establish pretext, "so long as the belief was honestly held." *Ptasznik*, 464 F.3d at 696. Eiter does nothing to establish anything to the contrary.

Morever, even if Vasquez, Galligan, and Johnson heard her say "freaking" and not "fuck," Eiter must still produce evidence giving rise to a reasonable inference that Three Rivers

---

[9] Eiter contends that a plaintiff may establish pretext by demonstrating that: "(1) Defendant's explanation had no basis in fact, or (2) the explanation was not the real reason, or (3) … the reason stated was insufficient to warrant the adverse job action." (Resp Br. 24.) However, test numbers one and three were explicitly abandoned by the Seventh Circuit in *Forrester*. *See* 453 F.3d at 417-19 (finding that test number two "is all the law needs").

[10] Eiter does not deny that Vasquez, Galligan, and Johnson heard her utter something on February 23; instead, she claims only that she said the word "freaking" after leaving the room.

13

lied when it fired her for insubordination.[11] In that regard, Eiter's arguments merely evince her belief that her conduct was not insubordinate and that Three Rivers, therefore, was wrong to fire her for insubordination, which is not enough to establish pretext. *Id.* ("An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful . . . ."); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006) ("[A plaintiff] must establish that [the employer] lied about its reasons for firing [her]–not that [the employer] was wrong for firing [her] for the reasons it gave."); *Guerrero v. Ashcroft*, 253 F.3d 309, 314 (7th Cir. 2001) ("[W]e are mindful that we are not a super-personnel board . . . and that we may not punish an employer for choices that constitute business decisions alone, no matter how unwise or mistaken they may seem to us.").

For example, Eiter claims that: (1) she walked out of the February 23 meeting as a result of the frustration brought on by Johnson's refusal to her let her speak about Vasquez's shortcomings and his continual shaking of his finger in her face; and (2) she refused to sign the reprimand at the February 25 meeting because she disputed Three Rivers's contention that she cursed at the February 23 meeting. These arguments are insufficient to establish that Three Rivers lied about its reason for firing her, as they are no more than an attempt to justify her behavior at the meetings.[12] *See Ptasznik*, 464 F.3d at 696; *Hague*, 436 F.3d at 824. Furthermore,

---

[11] Eiter apparently concedes that if she did use the term "fuck" that that would have been an act of insubordination.

[12] Eiter also alleges that pretext can be inferred from Johnson's other acts of "contempt" against her, namely his refusal to grant her a postponement of transfer to the Dupont branch and his failure to ensure that she was receiving the training at the Dupont branch that he had promised. (Resp. Br. 25.) These arguments, however, reveal nothing about whether Johnson's decision to terminate her on February 25 for insubordination was a deliberate falsehood and was instead based on discrimination. *Cf. Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004) (quoting *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 686 (7th Cir. 2003)) (lamenting the tendency of plaintiffs to "simply collect[] the sum total of all the unpleasant events in [their] work history").

14

the proposition that uttering the word "freaking" is not a curse word, nor an act of insubordination, is a tenuous one, as "freaking" is generally regarded as a replacement for the word "fucking." *See* The Online Slang Dictionary, http://www.ocf.berkeley.edu/~wrader/slang/f.html (last visited Nov. 17, 2006); Urban Dictionary, http://www.urbandictionary.com/define.php?term=freakin (last visited Nov. 17, 2006).

Finally, Eiter claims that pretext can be inferred from the fact that the current management structure at Three Rivers is uniformly Caucasian, that none of the sixteen assistant managers hired by Johnson were persons of color or minorities, and that Johnson terminated two assistant managers of ethnic background. Contrary to Eiter's contentions, this evidence is insufficient to establish pretext. As the Seventh Circuit recently observed, "[P]laintiffs must do more than merely point to [national origin] and proclaim: 'Aha! Discrimination.'" *Hague*, 436 F.3d at 829.

At best, Eiter's evidence is "anecdotal," as she offers no information regarding "how many positions became available during the relevant time frame, the number and [national origin] of the candidates applying for those positions, and the candidates' relative qualifications." *Id.* Under similar circumstances, the Seventh Circuit has found evidence of a work force's composition to be "next to worthless." *Id.* at 828-29 (finding the plaintiffs' contention that an African-American business owner simultaneously fired all five Caucasian employees and replaced them with African-American employees was insufficient to establish pretext); *Millbrook v. IBP, Inc.*, 280 F.3d 1176-77 (7th Cir. 2002) ("[T]he fact that during a two-year time frame no blacks were hired to fill an unknown number of vacancies fails to create a

15

reasonable inference that [the employer] was lying . . . ."); *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996). Accordingly, Eiter's evidence of the racial composition of the management structure at Three Rivers does not, by itself, demonstrate pretext.

## V. CONCLUSION

In sum, Eiter fails to establish a *prima facie* case of age and national origin discrimination because she cannot demonstrate that Vasquez was similarly situated to her. Morever, Eiter does not carry her burden of showing that Three Rivers's reason for terminating her was pretextual, as she fails to establish that Three Rivers's belief that she was insubordinate was not honestly held. For these reasons, Three Rivers's Motion for Summary Judgment (Docket # 14) is GRANTED.  The Clerk is directed to enter a judgment in favor of Three Rivers and against Eiter.

SO ORDERED.

Enter for November 27, 2006.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge